**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ORELIUS BARNETT,**
    **Plaintiff,**

   **v.**         **Case No. 2:04-CV-1113**
             **JUDGE EDMUND A. SARGUS, JR.**
             **Magistrate Judge Terence P. Kemp**
**CITY OF COLUMBUS, et al.,**
    **Defendants.**

<u>**OPINION AND ORDER**</u>

   This matter is before the Court for consideration of the Defendants' Motion for Summary

Judgment (Doc. #15). For the reasons that follow, the motion is granted in part and denied in

part.

**I.**

   Plaintiff, Orelius Barnett ["Plaintiff"], brings this action against the City of Columbus and

three Columbus police officers, James Sandford, Jeffrey Lange and Thaddeus Alexander,

claiming violations of his constitutional rights pursuant to 42 U.S.C. § 1983. Plaintiff also

asserts state law claims for false imprisonment, false arrest, malicious prosecution, abuse of

process, assault and battery and intentional infliction of emotional distress. The Court has

jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

   This action arises as a result of events which occurred on October 25, 2003 at the Easton

Town Center, a mall located in Columbus, Ohio. Officers Sandford, Alexander and Lange,

detectives in the Strategic Response Bureau for the City of Columbus Division of Police, were

assigned to plain clothes detail that evening, assessing the possibility of gang-related activity at

Easton. (*Affidavit of Thaddeus Alexander* at ¶ 2).  Between 7:00 and 9:00 p.m., the officers

observed a large group of individuals whom they perceived to be possible gang members.  The

officers made this determination due to several identifiers, including particular clothing, verbal

expressions and the alleged display of gang signs. (*Affidavit of Jeff Lange* at ¶ 4; *Affidavit of*

*James Sandford* at ¶ 4).  The group pushed their way through a crowd of people on the first floor

and proceeded to the second floor of the mall. (*Id.*).  They were "boisterous, some were running,

were more verbal and were throwing what appeared to be gang signs.  They appeared to be

getting more disorderly." (*Sandford Affidavit* at ¶ 5).  Officer Lange, who was wearing his police

badge and identification around his neck[1], approached the group on the second floor and directed

them to stand by the wall. (*Id.* at ¶ 4).

As Officer Sandford approached the group on the second floor, he observed Officer

Lange become involved in an altercation with a person later identified as Bryan Williams, a

friend of Plaintiff. (*Sandford Affidavit* at ¶ 8).  Officer Sandford perceived that Plaintiff was

"going to interfere in that situation." (*Id.*).  Accordingly, Officer Sandford, who was wearing his

police badge and identification around his neck, approached and identified himself as a police

officer. (*Id.* at ¶ 9).  Officer Sandford positioned himself between Plaintiff and Officer Lange

and Bryan Williams.  He ordered Plaintiff to the wall and away from the confrontation between

Officer Lange and Williams. (*Id.*).

According to Officer Sandford, the Plaintiff said "Fuck you.  I am not going to stand

against the wall." (*Id.* at ¶ 10).  Plaintiff then allegedly took side steps to get around Officer

---

[1]The officers aver that their badges and identification were initially concealed but revealed when
they encountered the juveniles.

Sandford. Officer Sandford then attempted to stop Plaintiff first by positioning himself between Plaintiff and Officer Lange and then by "placing [his] hand on [Plaintiff's] left elbow / bicep area." (*Id.* at ¶ 11). According to Officer Sandford, Plaintiff then balled up his fists and tensed his upper body and arms. Plaintiff allegedly pushed Officer Sandford in the chest / shoulder area, knocking him backwards and causing him to lose balance. (*Id.* at ¶ 12). Officer Sandford then "delivered a punch and struck [Plaintiff] somewhere around the left eye." (*Id.* at ¶ 13). According to Officer Sandford, he did this in order to defend himself, to gain control over the situation and to lessen any risk to himself and Officer Lange. (*Id.*).

Officer Alexander observed Plaintiff push Officer Sandford. He approached to assist, identifying himself as a police officer, with his badge and identification visible. (*Alexander Affidavit* at ¶ 6). Officer Alexander attempted to grab Plaintiff from the rear as he was flailing his arms and trying to go after Officer Sandford. (*Id.* at ¶ 7). Officer Alexander avers that he identified himself as a police officer at least four times during the struggle. (*Id.* at ¶ 6). Officer Alexander was able to get Plaintiff to the ground in order to take him into custody. (*Id.* at ¶ 8). During this time, Plaintiff allegedly resisted Officer Sandford's orders to Plaintiff to get to the ground. (*Sandford Affidavit* at ¶¶ 14-15). During this same period, an unidentified person approached Officer Sandford from behind and grabbed him in a bear hug position thereby pinning Officer Sandford's arms and pulling him backwards. (*Id.* at ¶ 16). Officer Lange observed this and pulled the individual, later identified as Hiram Howard, away from Officer Sandford. (*Lange Affidavit* at ¶ 5). Once in custody, Plaintiff was charged with assault and resisting arrest. (*Sandford Affidavit* at ¶ 18).

The foregoing incident was captured on security videotape. A copy of the tape has been

3

filed with the Court. According to Officer Sandford, the tape shows that the incident occurred quickly. Officer Sandford avers that, approximately three seconds after ordering Plaintiff to the wall, Plaintiff is seen pushing Officer Sandford backwards. Approximately two to three seconds later, Officer Sandford is seen swinging at Plaintiff and Officer Alexander then grabs Plaintiff from behind. Both officers are seen struggling with Plaintiff and Officer Sandford is grabbed by another individual. Approximately eight or nine seconds later, Officer Lange pulls the individual from Officer Sandford's back. Approximately seven seconds later, the officers take Plaintiff to the ground. The entire incident takes place in about thirty seconds[2].

Plaintiff disputes the averments of the Defendant officers. According to Plaintiff, he and two friends, Bryan Williams and Michael Williams went to Easton on the evening of October 25, 2003 to watch a movie. (*Affidavit of Plaintiff* at ¶ 2). Plaintiff claims that as they were walking around waiting for the movie to start, a man began directing a group of "younger kids" against the wall. Plaintiff claims that he and his friends were not with the group and therefore attempted to walk around. (*Id.* at ¶ 4). According to Plaintiff, Officer Lange ordered Plaintiff's friend, Bryan Williams, to the wall. Williams tried to explain that he was not part of the group, but Officer Lange allegedly "grabbed Bryan by his shirt and slammed him to the ground." (*Id.* at ¶ 6). Plaintiff claims that Officer Lange did not identify himself as a police officer and Plaintiff did not see any visible identification. (*Id.*). Plaintiff avers that, as he approached his friend and Officer Lange, Officer Sandford stepped between them and "grabbed my sleeve and pushed me away from Bryan, who was still on the ground with Officer Lange." (*Id.* at ¶ 10). Plaintiff

---

[2]The Court has reviewed the videotape. Plaintiff does not dispute the accuracy of the tape. The events on tape transpire quite quickly as the speed of the tape is accelerated.

claims that Officer Sandford was not in uniform and Plaintiff avers that he did not see any identification on his person. (*Id.* at ¶ 9).

Plaintiff claims that because he was concerned for his friend and unaware that the men were police officers, "I attempted to free myself from Officer Sandford's grasp by pulling my arms away from Officer Sandford in a downward motion." (*Id.* at ¶ 11). Plaintiff claims that Officer Sandford then "immediately atttempt[ed] to strike me with a closed fist. In addition, and almost immediately, another man [Officer Alexander] grabbed me from behind." (*Id.* at ¶ 12). Plaintiff alleges that Officer Sandford swung at him multiple times while Officer Alexander allegedly held Plaintiff's arms behind his back. (*Id.* at ¶ 13). According to Plaintiff, this continued until Hiram Howard grabbed Officer Sandford from behind. (*Id.*). Officer Sandford then allegedly pushed Plaintiff to the ground by the neck and head. (*Id.* at ¶ 14). Plaintiff claims to have suffered multiple injuries to his face, including a black eye, cut lip and soreness as a result. (*Id.* at ¶ 16). Plaintiff was arrested and later tried in municipal court on charges of assault and resisting arrest. The trial resulted in an acquittal.

As a result of the foregoing events at Easton, Plaintiff filed this action asserting violation of his rights under federal and state law. The Defendants move for summary judgment on all of Plaintiff's claims. With this background in mind, the Court considers the merits of the motion.

## II.

The procedure for considering whether summary judgment is appropriate, is found in Fed. R. Civ. P. 56(c); this section provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions,

5

answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce

6

more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586).  Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.*  That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## III.

### A.  Plaintiff's Claims against the Defendant Officers pursuant to 42 U.S.C. § 1983

In his Complaint, Plaintiff presents claims pursuant to § 1983 for alleged violations of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.   To the extent Plaintiff seeks monetary damages, Defendants argue that they are protected by the doctrine of qualified immunity.

The doctrine of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Before considering a claim to qualified immunity, the Court must first determine whether the Plaintiff has stated a claim under § 1983. If the Plaintiff states a claim, then the question of qualified immunity must be addressed. *McLaurin v. Morton*, 48 F.3d 944, 947 (6th Cir.1995).  In other words, the first inquiry is whether Plaintiff as established violation of a constitutional right.  If this is shown, the second inquiry is whether

the right was so clearly established that a reasonable official would understand that the particular conduct at issue violated the right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Thus, the Court first considers the merits of Plaintiff's constitutional claims.

### 1. Fourth Amendment Claim

With respect to the merits of Plaintiff's § 1983 claim for alleged wrongful arrest and excessive force, the Court observes at the outset that, since the alleged use of force occurred during the course of Plaintiff's arrest, the claim must be judged under Fourth Amendment, rather than Eighth Amendment, standards. *Whitley v. Albers*, 475 U.S. 312 (1986); *Graham v. Connor*, 490 U.S. 386 (1989). In *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir.1988), the Sixth Circuit held that "the seizure which occurs when a person is arrested continues throughout the time the person remains in the custody of the arresting officers." (citation omitted).

### Alleged Wrongful Arrest

As to the first aspect of Plaintiff's Fourth Amendment claim, the alleged wrongfulness of Plaintiff's arrest, the Defendants argue that, in order to be successful, the Plaintiff must show that the officers lacked probable cause to arrest him. According to Defendants, the record establishes that there was probable cause to arrest Plaintiff. In addition, Defendants argue that Plaintiff is precluded from litigating the issue of probable cause in this Court since it has already been challenged in the Franklin County Municipal Court[3].

---

[3]The matter was litigated in the context of a Motion to Suppress. Judge Liston concluded that Officer Sandford had a reasonable suspicion based on articulable facts to detain Plaintiff and that he also had probable cause to arrest Plaintiff for the offenses of assault and resisting arrest. Thus, the motion

In response, Plaintiff argues that Defendant should not be permitted to argue collateral estoppel or res judicata because these defenses were not raised in the Answer. In addition, Plaintiff argues that he did not have a full and fair opportunity to litigate the probable cause issue in state court. Defendants disagree and point out that a hearing was held on the probable cause issue. According to the prosecutor in the state court case, the hearing lasted from April 13 to April 15, 2004, "[b]oth sides appeared, with counsel, and were given the opportunity to present evidence and argue their positions." (*Affidavit of Lara N. Baker* at ¶ 3).

In the Court's view, the fact that Defendants did not raise the defense of collateral estoppel or res judicata in their Answer does not necessarily preclude the Court from applying these doctrines. As the Sixth Circuit has held, the failure to raise these affirmative defenses by responsive pleading "does not always result in waiver." *Smith v. Shushka*, 117 F.3d 965, 969 (6th Cir. 1997) (citation omitted). According to the Sixth Circuit, the Court may "overlook waiver and address the preclusion issue ." *Gilbert v. Ferry*, 413 F.3d 578, 580 (6th Cir. 2005), citing *Clements v. Airport Auth. of Washoe County*, 69 F.3d 321, 329 (6th Cir. 1995). In so doing, the purposes of the doctrine of collateral estoppel are served in that application of the doctrine works "to shield litigants (and the judicial system) from the burden of re-litigating identical issues and to avoid inconsistent results." *Id.*, citing 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4403 at 11-18.

Thus, the Court concludes despite Defendants' failure to raise the defense of collateral estoppel in their Answer, the Court may consider whether the doctrine precludes Plaintiff from litigating the issue of probable cause in this Court. As Plaintiff points out, "an absolute due

---

was denied and Plaintiff, who was the Defendant in the state court, proceeded to trial on the charges.

process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action." *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1268 (6th Cir. 1986). Based on the record presented, the Court finds no dispute as to these elements. The identical issue of probable cause to detain and arrest Plaintiff was actually litigated before the Municipal Court, the court directly determined the issue, and the issue was essential to the decision in the prior action. In addition, Plaintiff was represented by counsel in the criminal proceedings[4], an evidentiary hearing was held, and the court made a reasoned decision on the record.

The Sixth Circuit holds that, in a federal court § 1983 case in which a Plaintiff seeks to revisit the issue of probable cause previously litigated in a state criminal proceeding, "this circuit has found merit to the claim only where the plaintiff was unable to place on the state court record allegations about the false statements or misrepresentations by law enforcement officials, or some basis to demonstrate sufficient evidence to require an evidentiary hearing on the issue of probable cause." *Prokos v. City of Athens*, 118 Fed. Appx. 921, 927 (6th Cir. 2004), citing *Hinchman v. Moore*, 312 F.3d 198, 202-04 (6th Cir. 2002); *Darrah v. City of Oak Park*, 255 F.3d 301, 310-11 (6th Cir. 2001); *Buttino v. City of Hamtramck*, 87 Fed. Appx. 499, 503-04 (6th Cir. 2004); *Josey v. Salisbury*, 1993 WL 476974, *2 (6th Cir. 1993). The facts in this case do not fit any of these exceptions. In addition, the fact that Plaintiff herein was acquitted in the underlying

---

[4]The Court also notes that Plaintiff was represented by Frederick Benton, who is one of the most capable and conscientious attorneys to appear in criminal matters before this Court. The Court therefore has little doubt that Plaintiff had a full and fair opportunity to litigate the probable cause issue in state court. Moreover, the record of state court proceedings reveals this was in fact the case.

state court case does not change the analysis. *See Lomaz v. Hennosy*, 151 F.3d 493, 499 n.8 (6th Cir. 1998) (collateral estoppel bars the relitigation of the issue of probable cause in a later § 1983 suit even where the defendant in the prior criminal case was acquitted).

This Court concludes that Plaintiff is precluded from relitigating the issue of probable cause in this Court.  To the extent that Plaintiff claims his detention and arrest were without probable cause in violation of the Fourth Amendment, the Plaintiff's § 1983 claim is without merit.

### Alleged Excessive Force

Plaintiff also claims that the Defendant Officers used excessive force upon him in violation of the Fourth Amendment.  In *Graham v. Connor*, *supra*, the Supreme Court defined the contours of a Fourth Amendment claim for excessive force. The Court stated: "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.'" *Graham v. Connor*, 490 U.S. at 396 (citations omitted).  Indeed, the right to make an arrest "carries with it the right to use some degree of physical coercion or threat" to effect the arrest.  *Id.*  The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*, citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968).  The "reasonableness" inquiry is judged under an objective standard.  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

11

The Court reiterated that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id.* (internal citation omitted).

In this case, the Court concludes that genuine issues of material fact exist as to whether excessive force was used upon Plaintiff. Plaintiff maintains that he and his friends were not part of the group whom the Defendant Officers perceived to have possible gang affiliations. In addition, Plaintiff contends that as he approached his friend, whom Officer Lange had ordered to the wall, Officer Sandford grabbed Plaintiff's sleeve and pushed Plaintiff. (*Plaintiff's Affidavit* at ¶ 10). Furthermore, although the Defendant Officers aver that they identified themselves as police officers and displayed their badges, Plaintiff claims that he was not aware of the same. (*Id.* at ¶ 9). According to Plaintiff, as he tried to free himself from Officer Sandford, the officer struck him with a closed fist and Officer Alexander grabbed Plaintiff from behind. (*Id.* at ¶¶ 11-13). Plaintiff claims that Officer Sandford ultimately pushed Plaintiff to the ground by the neck and head, causing him to suffer injury to his face. (*Id.* at ¶¶ 14, 16). Plaintiff makes no allegation that Defendant Officer Lange used force upon him.

In contrast to Plaintiff's averments are the averments of the Defendant Officers, who maintain that Plaintiff was defiant to their orders and that he initiated the struggle by pushing Officer Sandford. The Defendant Officers maintain that they used only force that was reasonably necessary in light of the circumstances. In view of these sharply divergent claims, the issue of reasonableness of the Officers' conduct can only be determined by a jury.

As for Defendants' contention that their conduct is shielded by the doctrine of qualified immunity, as stated *supra*, this Court must "determine whether the [Defendants'] alleged conduct violated clearly established statutory or constitutional rights of which a reasonable person would

have known." *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994) (citations omitted).  In order to determine whether a right is clearly established, the Court looks to decisions of the Supreme Court, decisions of the Sixth Circuit and courts within our circuit, and finally to the decisions of other circuits.  *Id.*  With regard to the Fourth Amendment claim in this case, the right to be free from the use of excessive force by police officers is clearly established.  *Graham v. Connor*, 490 U.S. 386, 392-93 (1989).  Nevertheless, because genuine issues of material fact exist as to the reasonableness of the Defendant Officers' conduct, summary judgment on the issue of qualified immunity is not appropriate.  *Poe v. Haydon,* 853 F.2d 418, 425 (6th Cir. 1988) (holding that "summary judgment would not be appropriate if there is a factual dispute (i.e. a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violated clearly established rights.")[5].

For these reasons, the Court concludes that Defendant Officers Sandford and Alexander are not entitled to summary judgment on Plaintiff's § 1983 claim for excessive force.  The Court concludes, however, that Defendant Officer Lange is entitled to summary judgment since Plaintiff has made no allegation that this Defendant used any force upon him.

### 2. Other Constitutional Claims

In his Complaint, Plaintiff asserts claims under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983.  Plaintiff fails to

---

[5]Accordingly, if a constitutional violation is shown in this case (a question for the jury to consider), then the Defendants would not be entitled to qualified immunity because the right to be free from excessive force is a clearly established right of which the officers would have known.

articulate any basis for relief under these provisions and does not address them in his

Memorandum *contra*. Accordingly, the Court concludes that any claim Plaintiff may have

initially intended to raise under these provisions has been abandoned.

## B.  Plaintiff's Claim against the Defendant City pursuant to 42 U.S.C. § 1983

Plaintiff seeks to hold the City of Columbus liable under § 1983 for its alleged failure to

"instruct, supervise, control and/or discipline" the Defendant Officers in the performance of their

duties.  Plaintiff claims that the city has a pattern or practice of failure in this regard, particularly

with respect to claims of excessive force.  (*Complaint* at ¶¶ 61-62).  The Defendant moves for

summary judgment on this claim, arguing that there is no evidence of a City custom or policy of

alleged failure to discipline.

The City of Columbus is considered a "person" for purposes of liability under § 1983[6].

Municipal liability is, however, limited to situations in which the deprivation of constitutional

rights results from the official policy or custom of the municipality.  *Monell v. Dept. of Social*

*Services*, 436 U.S. 658, 690 (1978).  A municipality cannot be held liable simply on a theory of

*respondeat superior*.  *Id.* at 691.

In opposing the Defendant City's motion for summary judgment, Plaintiff argues that,

although the City's procedures and standards for addressing complaints of excessive force appear

fair and impartial, the City has allegedly not applied the standards in such a manner.  Plaintiff

---

[6]Section 1983 creates a federal cause of action against a state or local official who deprives a
person of a federal right while acting under color of state law.  42 U.S.C. § 1983.

points to thirteen alleged examples in this regard[7].

First, Plaintiff cites IAB[8] Database No. 2002 09 02 01, in which two witnesses allegedly saw an officer repeatedly kick and strike an individual being placed under arrest. According to Plaintiff, an investigation was not performed because of inconsistencies in the witnesses' accounts, and a lack of injury to the alleged victim.

The second is IAB Database No. 2001 11 0046, in which a citizen claimed he was choked, threatened and called a name during the course of arrest for a traffic stop. The officer denied the allegations and stated that the citizen was verbally abusive toward the officer. There were no witnesses to the alleged incident. The investigator dismissed the complaint for inconclusive evidence.

The third is IAB Database No. 2001 11 0068, in which a citizen complained that during his arrest he was thrown in a police cruiser. The officer denied the allegation. The alleged victim gave conflicting versions of events to the investigator and the officer's version was credited.

The fourth is IAB Database No. 2001 12 0104, in which a witness complained of seeing excessive force used during a traffic stop. The officer denied the allegation. Persons present during the incident gave inconsistent statements regarding the matter. Upon investigation, the officer's version of events was credited.

---

[7]In a sur-reply filed on January 20,2006, Plaintiff argues that he is relying on 67 investigations with respect to complaints of excessive force by Columbus police officers. Plaintiff identifies additional cases by IAB Database number in his Memorandum *contra* at 13-14, n. 7-9. Plaintiff asks the Court to consider all of the referenced complaints in support of claim. The Court has reviewed the evidence and finds that the instances are not materially different from the 13 the Plaintiff has chosen to highlight in his brief.

[8]"Internal Affairs Bureau," the internal department of the Columbus Division of Police tasked with investigating claims of misconduct lodged against police officers.

The fifth is IAB Database No. 2002 01 0049, in which two African-American minors claimed that officers, en route to investigate a robbery, confronted them for no reason and used force upon them. The minors were allegedly walking in the street at the time because the sidewalk was impassable due to a snow storm. According to the officers, they requested the boys to move from the street as they needed to get to the robbery scene. The boys were allegedly defiant to the order and one boy fell in the snow without any provocation from the officer. No injury was reported. The investigator credited the officer's version of events as to the incident.

The sixth is IAB Database No. 2002 01 01 11, in which a citizen complained that he was kicked in the face during the course of an arrest. The citizen was face down at the time and did not actually see the kick, but claimed it felt like a kick. The officer claimed that as he attempted to handcuff the citizen who was lying on the ground , the officer's knee slid and his leg collided with the citizen's head. The complainant had some injury to his face but it was determined that the injury was consistent with the officer's version of events.

The seventh is IAB Database No. 2002 02 0086, in which an officer allegedly stomped on the head of a potential arrestee during the execution of a search warrant. Although a witness claimed to see the incident, because the officer could not be identified, the allegation was dismissed.

The eighth is IAB Database No. 2002 10 0238, in which a prostitute claimed that an officer struck her in the face thirty to forty times during the course of an arrest. The officer recounted that the woman was violent toward him, that she kicked him and attempted to flee. The officer stated that he struck the woman four times in the face during the struggle. The woman suffered injury to her face. After an independent investigation, it was determined that the

16

extent of force used was justified.

The ninth is Database No. 2002 11 00119, in which four young women near the Ohio

State campus claimed that an officer driving at a high rate of speed allegedly almost hit one

woman. After stopping, the officer allegedly then grabbed the woman by her shirt or her arm and

escorted her to an alley. The officer denied the allegation. The woman was intoxicated and was

cited for having an open container in her hand. The investigator concluded that it could not be

determined whether the allegation of force was true and the complaint was dismissed.

The tenth is Database No. 2002 110220, in which an OSU student claimed an officer shot

a rubber bullet at him during the 2002 riots after the Ohio State / Michigan football game riots.

The investigator determined there was no evidence to support the claim as only kneeknockers[9]

and chemical sprays were used by the officers.

The eleventh is Database No. 2002 120188, in which an officer allegedly bashed an

individual's head on the back of a cruiser. The complaint was dismissed as unsupported by

evidence. In reaching this conclusion, the investigator credited the testimony of a tow truck

driver at the scene who stated that the individual caused injury to himself by smashing his own

head on the cruiser.

The twelfth is Database No. 2002 06 0163, in which a police officer allegedly roughed up

a citizen during the course of arrest for a traffic violation. The officer claimed he did not use

force and that the citizen was intoxicated. This account was credited. The officer was, however,

cited for violation of two codes of conduct. In an attempt to determine if the citizen was

---

[9]It appears from the report that the claimant defined a rubber bullet as a kneeknocker. According to the police officer, the rubber bullet is not a kneeknocker.

intoxicated, the officer told the citizen he was stopped because he was a possible homicide suspect. This was an untrue statement and the officer was disciplined for this act.

The thirteenth is Database No. 2002 070030, in which a citizen claimed she was allegedly pushed by an officer during the course of a large disturbance involving twenty individuals. Several police had responded to the scene. The officer stated that she advised the woman to get out of the way but the woman failed to comply and ran into the officer's outstretched hand in an attempt to join the group of individuals engaged in the fight. The officer then pushed the woman and told her to get back, at which point the woman went to sit down. There were no witnesses to the incident and the complaint was dismissed as unable to be determined whether it was true or not.

According to Plaintiff, the foregoing incidents demonstrate a "pattern or practice of deliberate indifference by the City when it comes to addressing allegations of excessive force by officers." (*Memorandum contra* at 39). The Defendant City points out that these 13 incidents amount to 4% of the investigations undertaken with regard to claims of excessive force. In addition, Defendant argues that every complaint was investigated and the findings were made after a thorough consideration of the evidence in each case. Defendant points out that most of the thirteen instances cited involved persons engaged in illegal activity. According to the Defendant, the instances do not constitute evidence of a pattern, custom or policy of the City regarding excessive force.

The Sixth Circuit holds that, in order to establish that the City has a custom or policy condoning the of use of excessive force by law enforcement, the Plaintiff must show the following:

(1) the existence of a clear and persistent pattern of [illegal activity];
(2) notice or constructive notice on the part of the [defendant];
(3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
(4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005), quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996).

In the Court's view, the evidence proffered with respect to allegations of a pattern or policy of use of excessive force by Columbus police officers falls far short of the foregoing standard. The incidents do not serve to show that the City of Columbus condoned conduct amounting to excessive force or that it acted with deliberate indifference so as to amount to the City having an official policy of inaction[10]. All of the thirteen incidents cited by Plaintiff were investigated and found to be without merit. While these incidents involved differing versions of the facts, this Court has no record or factual basis from which to conclude that the Internal Affairs Bureau acted illegally or otherwise condoned unconstitutional behavior. The Plaintiff has offered no evidence to challenge the findings. Finally, there is nothing in the record that would show a connection with the Plaintiff's allegation of constitutional deprivation in this case.

In sum, the Court finds that summary judgment is warranted on Plaintiff's § 1983 claim against the City of Columbus.

---

[10]In fact, the evidence demonstrates that the City has investigated every allegation of excessive force, contained on Exhibit A attached to the parties' Stipulation, Doc. #22. The fact that Plaintiff may not agree with the outcome of the investigations does not satisfy a claim for liability under § 1983.

## C. Plaintiff's State Law Claims

In his Complaint, Plaintiff asserts the following state law claims: false imprisonment, false arrest, malicious prosecution, abuse of process, assault and battery and intentional infliction of emotional distress.

Defendants argue, as with the Fourth Amendment claim, that Plaintiff is precluded from challenging the probable cause issue that was previously litigated in state court. The Court considers this argument in the context of addressing the merits of each of Plaintiff's state law claims.

### 1. False Imprisonment / False Arrest

Under Ohio law, there is a difference between the torts of false arrest and false imprisonment, although the terms are often used interchangeably. False arrest, which involves deprivation of a person's liberty without lawful justification, is performed by an authority with arrest powers. In contrast, false imprisonment involves the unlawful detention by a private party. Since the Defendants in this case are police officers, Plaintiff's claim, if any, is for false arrest not false imprisonment.

Under Ohio law, a claim for false arrest requires proof of "(1) a detention of the person, and (2) an unlawful detention." *Faulkner v. Faulkner*, 2000 WL 5910, at *1 (Ohio App. 6 Dist. 2000). It is undisputed in this case that Plaintiff was detained. The issue is whether the detention was unlawful. Defendants argue that this has already been litigated in the Municipal Court in the context of determining whether Defendants had probable cause to detain and arrest Plaintiff. As indicated *supra*, the state court judge concluded that probable cause existed. Under Ohio law,

20

the existence of probable cause is an affirmative defense to a false arrest claim. *Walker v. Schaeffer*, 854 F.2d 138, 142-43 (6th Cir. 1998).

For the reasons stated above, the Court finds that the issue of probable cause is barred by the doctrine of collateral estoppel. The Plaintiff had a full and fair opportunity to litigate the issue in state court where, after careful consideration of the matter, the court found that probable cause to arrest and detain Plaintiff was present. In view of the fact that probable cause to arrest Plaintiff existed, the Plaintiff's state law claim for false arrest is without merit. The Defendants are entitled to summary judgment on this claim.

## 2. Malicious Prosecution

To prove a claim of malicious prosecution under Ohio law, a Plaintiff must show the following: "(1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the accused." *Trussell v. Gen. Motors Corp.*, 53 Ohio St.3d 142 (1990). The Ohio Municipal Court found probable cause and this decision will not be relitigated in this Court. Since lack of probable cause is an element of the claim for malicious prosecution, Plaintiff cannot succeed on this claim. The Court therefore concludes that Defendants are entitled to summary judgment on Plaintiff's state law claim for malicious prosecution.

## 3. Abuse of Process

Under Ohio law, a claim for abuse of process involves a showing of the following elements: (1) that a legal proceeding has been set in motion in proper form and with probable

cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process. *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.* 68 Ohio St.3d 294, 298 (1994).

In this case, Plaintiff offers no evidence to support elements two and three of the claim. There is nothing in the record to show that the underlying proceeding was perverted to accomplish some ulterior purpose or that Plaintiff was damaged by some wrongful use of process. As the Ohio Supreme Court has stated, "abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order." *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 271 (1996). There is no evidence to show such a circumstance in this case. The Court therefore concludes that Defendants are entitled to summary judgment on Plaintiff's abuse of process claim.

### 4. Assault and Battery

Plaintiff claims that it is undisputed that Defendant Officers Sandford and Alexander committed assault and battery on Plaintiff because Plaintiff was grabbed and hit by the officers during the course of arrest. The Defendant officers maintain that their actions were necessary to control Plaintiff and prevent any attack on them.

As stated above in the context of Plaintiff's excessive force claim, it is for the trier of fact to determine the sequence of events and whether the extent of force used on the Plaintiff was justified under the circumstances. For this reason, the Court cannot conclude, as a matter of law, that Defendants are entitled to summary judgment on Plaintiff's assault and battery claim. As the Sixth Circuit recently observed, an officer who "uses more force than necessary to make an arrest

22

and protect himself from injury . . . is liable for assault and battery." *D'Agastino v. City of Warren*, 75 Fed. Appx. 990, 994 (6th Cir. 2003), quoting *City of Cincinnati v. Nelson*, No. C-74321, 1975 Ohio App. LEXIS 7443, *5 (May 5, 1975). Thus, since genuine issues of material fact exist as to the excessive force claim, genuine issues of material fact remain as to whether Defendants Sandford and Alexander committed assault and battery on Plaintiff.

The Court notes that Officers Sandford and Alexander claim that they are entitled to immunity on Plaintiff's assault and battery claim, pursuant to R.C. § 2744.03(A)(6)[11]. If a jury were to credit the Plaintiff's version of the incident, it is conceivable that the same jury could find the Officers acted in bad faith. A jury could also credit the Officers' version and find for the Defendants. It is for the jury to decide whether immunity under § 2744.03(A)(6) applies in this case. In sum, the Defendants are not entitled to summary judgment on the assault and battery

---

[11]The statute provides that:
(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

R.C. § 2744.03(A)(6).

23

claim.

## 5. Intentional Infliction of Emotional Distress

Under Ohio law, the standard for the tort of intentional infliction of emotional distress is as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if some bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America* 6 Ohio St.3d 369, 374 (1983). In order to be successful on a claim for intentional infliction of emotional distress, a plaintiff must show that the Defendants' conduct "was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community." *Pyle v. Pyle*, 11 Ohio App.3d 31, 34 (Eighth Dist. 1983) (internal quotations omitted). In addition, to be successful, the emotional stress allegedly suffered must be serious. *Yeager, supra.*

Plaintiff argues that because he was assaulted by the Defendant officers and later acquitted of the criminal charges that he suffered severe emotional harm sufficient to support a claim for intentional infliction of emotional distress[12]. The Defendants disagree, arguing that there is no evidence to show that their conduct was so extreme and outrageous as to go beyond all possible bounds of decency.

In the Court's view, the evidence falls short of creating a genuine issue of material fact on

---

[12]In particular, Plaintiff avers that as a result of the incident and the jury trial, his school grades suffered and many fellow students in his high school stopped associating with him. According to Plaintiff, the events were very stressful for him. (*Plaintiff's Affidavit* at ¶ 18).

24

the intentional infliction of emotional distress claim.  While Plaintiff claims that the arrest and

subsequent criminal trial were stressful to him, this is not to say that the conduct goes beyond all

bounds of decency in society.  This is particularly so when an arrest is based on probable cause.

*See Shevlin v. Cheatham*, 211 F.Supp.2d 963, 971-72 (S.D. Ohio 2002) (Marbley, J.), citing *Piro*

*v. Franklin Township*, 102 Ohio App.3d 130 (Ninth Dist. 1995).   In sum, the Court finds no

genuine issues of material fact as to the Plaintiff's claim for intentional infliction of emotional

distress.  The Defendants are entitled to summary judgment on the claim.


**IV.**

In light of the foregoing, the Defendants' Motion for Summary Judgment (**Doc. #15**) is

**GRANTED in part and DENIED in part.**


**IT IS SO ORDERED.**


2-16-2006
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**